Edward J. MAGUIRE, III, Plaintiff,

v.

HUGHES AIRCRAFT CORPORATION,
et al., Defendants.

Civ. No. 87–4706 (CSF).

United States District Court,
D. New Jersey.

Nov. 8, 1989.

Steinberg, Ginsberg & Weitzman by Saul J. Steinberg, Paul F. Kulinski, Voorhees, N.J., for plaintiff.

Shanley & Fisher by Theodore S. Smith, Raymond M. Tierney, Jr., Morristown, N.J., for defendant Allison Gas Turbine Div. of Gen. Motors Corp.

Schwartz & Andolino by Wayne D. Greenfeder, Livingston, N.J., for defendant MPB Corp.

## OPINION

CLARKSON S. FISHER, District Judge.

The court is called upon today to decide a motion for summary judgment brought by

defendant Allison Gas Turbine Division of General Motors Corporation ("Allison") and a cross-motion for summary judgment brought by defendant MPB Corporation ("MPB") in the above-captioned matter. Plaintiff, Edward J. Maguire, III ("Maguire"), filed suit in the Superior Court of New Jersey, Law Division, Monmouth County, on August 5, 1987, seeking damages for personal injuries which he allegedly sustained in a helicopter accident on August 14, 1984, and in a motorcycle accident four days later. The superior court complaint named Hughes Aircraft Corporation ("Hughes"), Allison and several fictitious aliases for additional defendants that were unidentified at the time of filing.

The case was removed to this court by Allison on November 20, 1987, based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. An unopposed motion for summary judgment was granted in favor of Hughes (which had come to be known as McDonnell Douglas Helicopter) on November 23, 1988. On February 7, 1989, Allison received permission of the court to file a third-party complaint against MPB, and filed same on February 17, 1989. On June 28, 1989, United States Magistrate Freda L. Wolfson granted plaintiff leave to file an amended complaint naming MPB as a direct defendant. Maguire filed such a complaint on July 21, 1989. The instant motions followed.

*Facts*

Maguire was piloting a helicopter on a solo night training mission for the New Jersey Army National Guard on August 14, 1984. The aircraft, which was powered by an engine manufactured by Allison which included bearings manufactured by MPB, suffered an apparent engine failure, so Maguire conducted a forced landing.

An emergency-room physician examined plaintiff the night of the incident, and an army flight surgeon examined him the following day. Two days later, the army flight surgeon returned Maguire to active flight status, determining that he was medically fit. On August 18, 1989, Maguire collided with a curb while operating a motorcycle, thereby suffering personal injuries. Plaintiff claims that he had suffered injuries from the forced landing of the helicopter which caused him to lose consciousness while operating the motorcycle, and therefore the helicopter engine failure was the proximate cause of any and all injuries he received in both the helicopter incident and the motorcycle accident.

The helicopter engine was developed by Allison under contract with the United States Army. Both the engine's design concept and its individual designed components were reviewed, evaluated and approved by the defense department. The inspection and testing of the engine and its components were also approved and witnessed by the defense department. (Plaintiff's Opposition Brief, Exhibit A, Army Investigation Report). There is evidence that the engine failure was caused by a defect in the design of the MPB bearing. (Allison's Appendix, Exhibit 10). This bearing was not part of the original engine design, but was incorporated later. The substitution was the result of an engineering change proposal, the purpose of which was to prolong the service life of the engine bearing. Defendants base their summary-judgment motions on the government contractor defense, which was clarified by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), *reh. denied,* —— U.S. ——, 109 S.Ct. 1182, 103 L.Ed.2d 248 (1989).

*Summary Judgment*

■ The purpose of summary judgment is to eliminate unnecessary trials which would cause needless expense and delay. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Rule directs the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 173 (3d Cir.1988).

█ The current standard for summary judgment requires that before judgment is entered as a matter of law, there be no "genuine" issue of "material" fact; however, the mere existence of some alleged factual dispute between the parties is an insufficient basis on which to deny a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Id.*

The court is mindful that, in deciding a motion for summary judgment, it must construe the facts and inferences therefrom in a light most favorable to the nonmoving party. *Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

*Government Contractor Defense*

The government contractor defense provides that

[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, [on the manufacturer], when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 108 S.Ct. at 2518. The Court reasoned that imposing liability on government contractors would have a direct effect on the terms of government contracts: either the contractor would raise the price it charged for the product, or it would decline to manufacture the product according to the government specifications. *Id.* at 2515.

The Court found that the defense for government contractors fits within the "discretionary function" exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).[1] The Court held that design selection for military equipment constitutes a discretionary function within the meaning of the FTCA exception. *Boyle*, 108 S.Ct. at 2517. The design selection process involves the evaluation of a whole host of military, technical and social considerations, including the balancing of safety concerns against the need for combat effectiveness. *Id.*

Maguire opposes defendants' motions on the grounds that summary judgment would violate the underlying policies of *Boyle* and that there are genuine issues of material fact which preclude application of the *Boyle* criteria to the instant action. Plaintiff contends that there is no evidence of significant government involvement in the decision to use the MPB bearing. He also asserts that the bearing did not conform to the design project specifications. Plaintiff further argues that there is no evidence which indicates that defendants warned the government of potential risks of the MPB bearing of which the defendants were aware, but the military were not.

█ Maguire concedes that the government may have participated actively in the original engine design. (Plaintiff's Opp. Brief at 14). It is his contention that this same level of participation was required for, but was missing from, the subsequent incorporation of the MPB bearing into the overall design. However, a court within this circuit has held that the first government contractor defense criterion is met by

---

1. This provision states, in pertinent part, that government liability shall not attach to "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

a showing of government approval of the overall design. It is not necessary that there be "continuous back and forth discussions ... regarding the inclusion or exclusion of the specific design deficiency alleged in [the] case." *Wilson v. Boeing Co.*, 655 F.Supp. 766, 773 (E.D.Pa.1987).[2] Plaintiff's argument is incompatible with the *Wilson* holding.

Additionally, Maguire's assertion that there is no evidence of government involvement in the decision to change the bearing is inaccurate. Defendants have proffered evidence that the army was in full control of the process and was responsible for the determination to utilize the MPB bearing in the Allison engine. (*See* Supplemental Certification of Robert L. Jones). Plaintiff has submitted no evidence to indicate that the government was not actively involved in this decision-making process.

Maguire also argues that the bearing did not conform to specifications, because the Technical Data Report on the bearing change stated that the new bearing would have a B10 life of 1870 hours. (Allison's Appendix, Exhibit 5, 9th page). This means that ten percent of the MPB bearings are calculated to fail (theoretically) within 1870 hours of operation. (Affidavit of Robert L. Jones, ¶ 18). Since the engine failed following 711 hours of use after it was overhauled, (Allison's Appendix, Exhibit 10, p. 1), plaintiff argues that the bearing did not adhere to its specifications.

Defendants respond to this argument in several ways. First, they assert that the life of the bearing was not a specification, but, rather, was simply a piece of technical information. Secondly, they contend that there is no evidence that the bearing failed before the 1870-hour mark, since there is no indication that the bearing was replaced at the time of the engine overhaul. (Certification of Kenneth H. Ryan, ¶ 4). Finally, they argue that, even if the bearing's B10 life of 1870 hours were a specification and the bearing failed in less than 1870 hours,

such a failure would still be conforming, since it is within the statistical range of the data provided.

■ The court is not convinced that the life of the MPB bearing does not constitute a specification. The reason for the bearing change was to increase the service life of the bearing. (Allison's Appendix, Exhibit 5, p. 1). Therefore, it is logical that the increased life would become a specification. Nonetheless, plaintiff has provided no evidence that the bearing was ever changed, so it is entirely possible that it was in service for 2,664 hours. (*Id.*, Exhibit 10, p. 2). Lastly, it cannot be disputed that, if the B10 life of 1870 hours was a specification, then the only way there could be nonconformity is for more than ten percent of the bearings to fail in less than 1870 hours. The data stating that there will be a failure rate of 10 percent makes it impossible for the single failure of any one bearing to constitute nonconformity.

Maguire's argument that defendants did not warn the United States about the dangers in the use of the bearing which were known to defendants but not to the government is also without merit. Defendants have submitted evidence that they informed the military of all known risks of the engine design, including the bearing. (Supplemental Certification of Robert L. Jones, ¶¶ 3, 10). Plaintiff has not proffered any evidence to refute this in any way.

The policies which supported the *Boyle* decision also support the government contractor defense in the instant action. If liability were imposed on Allison and MPB, then future defense contractors would build the cost of potential liability into the price of products supplied to the government. The military made a decision, after an extensive design process, to award Allison a contract to produce helicopter engines which utilized an MPB bearing with a certain statistical failure rate. It is not proper for this court to second-guess that

---

**2.** The court notes that *Wilson* was decided before *Boyle*. *Wilson* was decided according to *Koutsoubos v. Boeing Vertol, Div. of Boeing Co.*, 755 F.2d 352 (3d Cir.), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). Though

*Koutsoubos* was also decided before *Boyle*, it utilized the same criteria as the Supreme Court in *Boyle* for the government contractor defense. Accordingly, *Koutsoubos* and its progeny are still instructive to this court.

decision by permitting an action to continue against the equipment manufacturers which supplied conforming products.

■ The reasoning and holding of this decision apply equally to Allison and MPB. The fact that MPB was a subcontractor and dealt with Allison, rather than directly with the government, is not sufficient to defeat MPB's motion. The same policies which support the defense for Allison are applicable to MPB. The government contractor defense can apply to subcontractors, as well as general contractors. *See Ramey v. Martin–Baker Aircraft Co.*, 656 F.Supp. 984 (D.Md.1987), *aff'd*, 874 F.2d 946 (4th Cir.1989).

This court finds that Maguire has not submitted any evidence which raises genuine issues of material fact. The assertions and arguments of counsel are not sufficient to defeat a motion for summary judgment. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626–627 (Fed.Cir.1984). Based on the evidence before it, the court further finds that the government approved reasonably precise specifications for the Allison engine, including the MPB bearing; the equipment furnished by defendants conformed to those specifications; and defendants, via Allison, warned the government about any risks in the use of the product which were known to them, but not to the military. The defendants have met the criteria set forth in *Boyle* for the government contractor defense, and, therefore, the invocation of that defense is appropriate in this case.

*Retroactive Application*

■ Plaintiff also asserts that, if defendants are found to meet the *Boyle* criteria, that case should not be applied here retroactively. In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court set forth the three-part test to determine whether to limit a decision to prospective application only. The factors are that:

(1) The holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;

(2) The merits and demerits in each case must be weighed by looking to the history of the rule in dispute, its purpose and effect, and whether retrospective operation will further or retard the rule's operation;

(3) Retrospective application must create the risk of producing substantially inequitable results.

*Hill v. Equitable Trust Co.*, 851 F.2d 691, 696 (3d Cir.1988), *cert. den. sub nom Data Controls North, Inc. v. Equitable Bank Nat'l Assoc.*, ⸺ U.S. ⸺, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). The general rule, however, is that cases will be given retroactive application. *Id.* at 697–98.

■ The *Boyle* holding neither overruled clear past precedent nor "decided an issue of first impression whose resolution was not clearly foreshadowed." *Id.* at 696. As noted *supra* at page 824, the government contractor defense, as articulated by *Boyle*, was recognized in this circuit before that Supreme Court ruling. When Maguire filed this suit in 1987, it had been 2½ years since the court of appeals had adopted the government contractor defense in *Koutsoubos*, 755 F.2d 352. The district court recognized the defense in December 1982, 1½ years before plaintiff's accident. *See Koutsoubos v. Boeing Vertol*, 553 F.Supp. 340 (E.D.Pa.1982), *aff'd*, 755 F.2d 352, *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59. This court cannot fathom how Maguire could reasonably have relied on any other rule.

The purposes of the *Boyle* rule would be advanced by applying the government contractor defense to the instant action. The same policies which were furthered by *Boyle* will be furthered here. *See supra* at 825.

Finally, the application of *Boyle* to this case will not produce substantially inequitable results. While the court acknowledges that the invocation of the defense will preclude a recovery by Maguire, it does not consider this substantially inequitable. The government contractor defense was the law of this circuit before

*Boyle* and before plaintiff filed this suit. Even if *Boyle* had never been decided, the result in this case would have been the same; therefore, the application of *Boyle* cannot be said to be inequitable.

*Conclusion*

For the foregoing reasons, Allison's motion for summary judgment and MPB's cross-motion for summary judgment are granted. No costs.